SUTHERLAND v. MURRAY et al. (two cases).

(Supreme Court, Appellate Division, Second Department.   November 24, 1915.)

1. TRIAL ⬅356—VERDICT—FORM.

The action was to invalidate a probated will.  The court submitted questions whether the testator was of sound mind, whether there was undue influence, and whether there was fraud.  The jury were given a copy of the questions, and directed to answer them in writing and sign their names.  After the jury's return, the court stated that, though all the jurors had signed the paper, they had not written answers to the questions.  The foreman stated they answered "Yes" to all of them, and several jurors stated that they did not agree on the question as to fraud.  The court directed the jury to retire and write in the answers to the questions.  They retired and returned, and the court stated that they seemed to have changed their minds as to the first interrogatory as to soundness of mind, answering "No," asking whether they had announced their answer incorrectly at first; the foreman stating that they found for plaintiff, and that they had answered "No," under the impression that such answer should be given for the verdict for plaintiff to stand.  The court asked if the jury determined the question of the validity of the verdict for plaintiff by finding that testator was insane.  The foreman answered they did not, and that he could see it was a mistake to write in "No," that their verdict was that the will was procured by undue influence, and that they rendered no verdict on the question as to fraud.  The court stated he thought the jury had become muddled, and would grant the motion to set aside the verdict, as it amounted practically to a disagreement.  *Held*, that the granting of such motion was improper, since at no time in either of the jury's returns to the court was there any question upon the point that they had agreed upon undue influence as a producing cause of the execution of the instrument.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 849–854;  Dec. Dig. ⬅356.]

2. WILLS ⬅355—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE.

In an action to adjudge invalid a probated will, charged to have been procured by undue influence, evidence *held* sufficient to warrant jury's finding of such influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 811–819;  Dec. Dig. ⬅355.]

3. NEW TRIAL ⬅165—MOTION TO VACATE ORDER—TIME.

Where plaintiff did not move at Special Term in Kings county to vacate the order setting aside verdict for him until after the end of the Trial Term in Suffolk county, where the case was heard, the Special Term had no power to grant such motion.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 334, 335;  Dec. Dig. ⬅165.]

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from Special Term, Suffolk County.

Action by Charles H. Sutherland against John E. Murray and another, individually and as executors. From an order setting aside verdict for him, and an order denying his motion for an order vacating the order setting aside the verdict, plaintiff appeals. Order setting aside the verdict reversed, and verdict reinstated; order denying the motion to vacate the order setting aside the verdict affirmed.

Argued before JENKS, P. J., and CARR, STAPLETON, MILLS, and RICH, JJ.

Frank X. McCaffry, of Brooklyn, for appellant.
John R. Vunk, of Patchogue, for respondents.

MILLS, J. These are two appeals by plaintiff from two distinct orders, the first of which orders was made at the Suffolk County Trial Term November 19, 1914, setting aside a verdict in favor of the plaintiff and granting a new trial, and the second of which orders was made at the Kings Special Term, denying a motion made by the plaintiff before the trial justice to vacate the first-named order.

The action was brought, under the former section 2653a of the Code of Civil Procedure, to have adjudged invalid an instrument which had been admitted to probate by the Surrogate's Court of Suffolk county as the last will and testament of the decedent, Thomas S. Sutherland, whose only child and heir at law is the plaintiff. The deceased lived all his lifetime, except a few weeks before his death, in the neighborhood of Troy, N. Y. He had been married twice, the plaintiff being a child of the first marriage, and both wives had died. In the fall of 1913 he left Troy and came to the village of Center Moriches, where he took up a residence in the home of Sarah E. Murray, an apparently prosperous widow, who was in the mid-sixties. Shortly after his arrival there, he took out a marriage license to marry Mrs. Murray, and after a few weeks a marriage ceremony was performed with her by the village priest, the witness Father Donlin. Sutherland was somewhere between 75 and 80 years of age. A few minutes after the marriage ceremony, which was performed while Sutherland was lying very sick in bed, he made a will, which was drawn up by one Riley P. Howell, a former justice of the peace and the local scrivener of legal instruments. The testimony shows that in this will he left all his property to his new wife for life, but with absolute power of disposition, with remainder over to her children. Two days later another will was made, in which the sum of $100 was bequeathed to the plaintiff, and the rest of the estate to the new Mrs. Sutherland in manner as provided in the earlier will, which was then destroyed. The decedent was a man of some property, approximating in value between $35,000 and $40,000. This will was admitted to probate by the surrogate of Suffolk county after a contest by the present plaintiff, and shortly thereafter this action was begun to adjudge the will invalid.

[1] The grounds set forth in the complaint were as follows: (a) Lack of testamentary capacity; (b) undue influence; (c) fraud perpetrated upon the decedent. The plaintiff introduced sufficient evidence to require the submission of questions (a) and (b) to the jury.

There was no evidence whatever of fraud, except as fraud is said to be an element of "undue influence," and the trial court so declared; but it submitted that question also to the jury on the urgent request of plaintiff's trial counsel. The questions as submitted to the jury were as follows:

"(1) Was the testator at the time of the execution of the will in question of sound mind and memory?

"(2) Was the execution of the will in question procured by undue influence practiced upon the testator?

"(3) Was the execution of the will in question procured by fraud practiced upon the testator?"

The jury were given a copy of the submitted questions, and were directed by the trial court to answer them in writing and to sign their names to the paper. Some time after they retired they returned to the court and handed up the paper in question, announcing that they had agreed upon a verdict. The record then shows a colloquy as follows:

"The Court: Gentlemen, you have all signed the paper, but you have not written in the answers to the questions.

"Mr. Foreman: We answer 'Yes' to all of them.

"By Several Jurors: No; we don't agree on No. 3.

"The Court: I tried to make it plain to you that you are to answer these questions, and should write the answer to them on the paper submitted; but you don't seem to understand it, or I did not make it plain to you. Do you yourself understand that you find this will a valid will or an invalid will?

"The Foreman: Yes; invalid.

"The Court: I think you had better retire again, and write in the answers to the questions then."

They retired, and shortly returned, and again handed up the paper, and the record shows a colloquy as follows:

"The Court: Now, gentlemen, since you were in before, you seem to have changed your mind upon the first interrogatory. Did you announce it incorrectly at first?

"Mr. Foreman: We find for the plaintiff.

"The Court: Do you mean to say, gentlemen, that you don't understand the questions propounded to you? The first interrogatory is: 'Was the testator at the time of the execution of the will in question of sound mind and memory?' And when you were in here before you said yes; you answered it 'Yes.'

"Mr. Foreman: If you remember, I said we answered 'Yes' to all, and I was under the impression that that was right, as we did not pay much attention to that part of it. When we got back in the room, they all said, in order for the verdict to stand, it should be put in 'No.'

"The Court: Do you determine that question by saying that you decide that this testator was insane at the time of execution of this will?

"Mr. Foreman: No; we did not.

"Mr. McCaffry: I except to your honor's use of the word 'insane'; it is simply a question of unsound mind and memory.

"The Court: I will withdraw it then. I simply used that to call their attention sharply to it. Do you make a distinction, gentlemen, between insanity and unsoundness of mind? If you do, I withdraw it.

"Mr. Foreman: I can only speak for myself. I can see that it was a mistake to write in 'No.'

"The Court: You intended it to be 'Yes'?

"Mr. Foreman: Yes; I think the jury will so understand it.

"The Court: Gentlemen of the jury, do you desire to find that this testator was of sound mind and memory at the time of the execution of this will, or of unsound mind?

"By Several Jurors: Of sound mind.

"The Court: The next question is: Was the execution of the will itself procured by undue influence practiced upon the testator? And the answer is 'Yes.' Is that your verdict?

"Mr. Foreman: Yes.

"The Court: That this will was not his free act, but that some one procured it by undue influence; is that what you desire to find?

"Mr. Foreman: Yes.

"The Court: The other question you don't render any verdict upon, the one as to fraud?

"Mr. Foreman: No.

"The Court: Do you wish to step back again and change your answer to the first interrogatory? Did the use of the word 'insane' make any difference to you? If it did, I withdraw it; it is unsound mind.

"Mr. McCaffry: I except to your honor's reference to insanity.

"The Court: I stated that I withdrew it. I withdraw it, if it makes any difference to them."

The jury again retires, and then returns into court and hands up the paper.

"The Court: I will read you the questions and your answers. 'Was the testator at the time of the execution of the will in question of sound mind and memory?' And the answer is 'Yes.' Is that your answer?

"Mr. Foreman: Yes.

"The Court: 'Was the execution of the will in question procured by undue influence practiced upon the testator?' And the answer to that is 'Yes.'

"Mr. Foreman: Yes.

"The Court: As to the third interrogatory, which I do not bother to read, you have been unable to agree upon?

"Mr. Foreman: Yes.

"Judge Vunk: Now, your honor, I move to set aside the verdict as contrary to law, contrary to the evidence and all—contrary to the weight of evidence and all the grounds stated in section 999 of the Code, which is applicable here.

"The Court: In view of the manner in which this verdict has been rendered and the testimony in the case, I will grant the motion. I think in some way this jury has become muddled.

"Mr. McCaffry: Yes; I agree with your honor that they have.

"The Court: I think it amounts practically to a disagreement."

The first answer of the foreman, as amended by the "several jurors," indicated clearly that the jurors had agreed to answer the first and second questions in the affirmative and had not been able to agree as to the third, all of which amounted to this: That they had found that, while the decedent possessed statutory testamentary capacity, the execution of the instrument had been produced by undue influence exerted upon him, and that therefore they, the jurors, found the instrument to be invalid as a will. When they came into court the second time, they had written in the answer "No" to the first interrogatory, and upon the trial justice calling their attention to the apparent inconsistency of that answer with their former oral declaration a colloquy followed, with the result that the jurors declared that they intended to find testamentary capacity, and their affirmative answer was taken to that, the first interrogatory. This confusion, if it be deemed such, was thus settled favorably to the defendants.

Upon their second return it appeared that the jurors had answered

the second interrogatory in the affirmative, which answer was also their final answer upon their third return. In short, at no time upon either of their returns into court was there the least question or confusion upon the matter or point that the jury had agreed that undue influence was proven as a producing cause of the execution of the instrument. Indeed, I perceive in the record as a whole very little ground to charge the jurors with confusion as to the proper substantial answer to the first question, but merely for a time as to the form of such answer. However that may be, I cannot see in the record the least ground to impute to the jurors any confusion or doubt at all as to either the substance or the form of the answer to the second interrogatory. I think, therefore, that the learned trial justice was in error, at least as to the issue of undue influence, in concluding, as he expressed himself, that "in some way this jury has become muddled." Whatever muddling of the jury there was appears to me to have operated in favor of the defendants, and perhaps to have aided in producing the finding of testamentary capacity, but not at all to have affected the jurors' finding of undue influence.

[2] The order entered by the trial court recites that the verdict was set aside as "contrary to the evidence." On the appeal from this order, the appellant contends that the verdict of undue influence had ample support in the evidence and should not have been disturbed by the trial court. The record on appeal is voluminous. I have examined it in detail. I am confident that if I had been the trial justice I would not have set aside the verdict of undue influence, nor would I have disagreed with the jury, had they found lack of testamentary capacity. If courts can be influenced by local considerations—and some people think that to be the case frequently—such considerations were evidently strong on the trial of this action. The defendants were important people in Center Moriches. One of them kept a "general store," and was a justice of the peace and an employer of men in the contracting business. The plaintiff was a stranger. Yet the jury overcame this local atmosphere. As the jury did not find a lack of testamentary capacity, I will not detail at length the evidence adduced by the plaintiff on this point, except to state that considerable testimony was given to show that after the death of Sutherland's second wife his personal habits underwent a great change, and that he became slovenly and filthy in habits and appearance. Experts called by the plaintiff testified, in answer to hypothetical questions, that the decedent was undergoing progressive senile dementia and was incompetent to make a will. There was rebutting evidence on this point from the medical attendants of the decedent, his lawyers at Troy and in New Jersey, and the jury may well have hesitated to find him incompetent generally. Yet there is very strong evidence in the case that would point to incompetence at the time the wills were made, and this may be considered on the question of undue influence to the extent that it discloses the mental condition of the decedent.

I would call attention to the testimony of Father Donlin. This testimony shows a vivid picture of a doting old man, on the edge of the grave, caught in the meshes of those who had no claims upon his

bounty. From this picture there was a legitimate inference that the marriage was hatched as an advisable preliminary to the will, and the circumstances attending each act, viz., the marriage and the making of the will, were the same, and both were dominated by the desire on the part of the defendants to acquire the old man's property for themselves. The immediate circumstances of the will-making are detailed by Riley Howell, called as a witness for the defendants; but, assuming every word of his testimony to be true, it does not negative to any considerable extent the legitimate inferences from Father Donlin's testimony. From the testimony of Father Donlin it is clear that on Saturday, November 15th, when this instrument was executed, the deceased was in a very weak condition. The first instrument of similar nature, except as to the legacy of $100 to the son, was executed on Thursday, November 13th; decedent being then sick in bed. At that time he had apparently forgotten entirely about the plaintiff, his only child, because, according to the testimony of the scrivener, he not only did not mention to him that he had any child, but said that he had no one to leave his property to except these people here, meaning the Murrays, the defendants. The following day the scrivener received a telephone message from the defendant John Murray, son of the new wife, to the effect that decedent had forgotten to tell him about his son and therefore wished to see him, and the scrivener appointed to go to him the next day, Saturday, and then did go and prepared and attended to the execution of the instrument here in suit.

The natural inference from all this is that the Murrays, in the interim, had become apprehensive that the will might be invalid because of its failure to mention the decedent's son, and therefore, to guard against that result, had planned to have a new will executed. The work of the scrivener in preparing the second will was for about 20 minutes interrupted by a call from the priest, who was admitted to the sick room at once upon the scrivener's retiring therefrom. The Father found the decedent then in an unconscious condition. He remained in the sick room 15 to 20 minutes, shaking him several times, but was unable to rouse him to consciousness, or to elicit from him anything more than an unintelligent mumbling. Upon retiring the priest met the wife, and was told by her that they had found that the first will was not a legal one, because the son had been left out entirely; and that now he was going to make a new will, which in fact was done within a few minutes. That very night, about midnight, the Father was summoned to the house and found decedent in a dying condition, unconscious, in which state he remained until he died the following Thursday. The entire situation, to my mind, speaks plainly and tells the story that the alleged will was the product of undue influence exerted upon the aged man by the Murray family; at least it impresses me very strongly that the jury were well warranted in making their finding of undue influence.

Therefore I recommend that the order first appealed from, namely, that setting aside the verdict and directing a new trial, be reversed, and the verdict reinstated, with costs.

[3] As to the second appeal, that from an order denying a motion

by the plaintiff to vacate the order setting aside the verdict, I think we must affirm. The motion was made after the end of the Trial Term in Suffolk county and at Special Term in Kings county. The Special Term had no power to grant it. Duerr v. Consolidated Gas Co., 104 App. Div. 465, 93 N. Y. Supp. 766.

Order setting aside verdict and directing a new trial reversed, and verdict reinstated, with costs. All concur.